# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KEZLYN MENDEZ,** | : | |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | **No. 3:18-CV-1929 (VLB)** |
| | : | |
| **WILLIAM MULLIGAN, et al.** | : | |
| *Defendants.* | : | **January 15, 2019** |

### INITIAL REVIEW ORDER

On November 28, 2018, the plaintiff, Kezlyn Mendez, an inmate currently confined at the MacDougall-Walker Correctional Institution ("MWCI") in Suffield, Connecticut, filed a complaint *pro se* pursuant to 42 U.S.C. § 1983, against twelve Department of Correction ("DOC") officials in their individual and official capacities. Compl. (Dkt. No. 1). The twelve defendants are Warden William Mulligan, Captain Craig Paton, Captain Rivera, Lieutenant Legassey, Lieutenant Harris, Supervisor Oliver, Supervisor Ralph Rossi, Supervisor Osle, Supervisor Johnson, Supervisor Rodriguez, Supervisor Williams, and Counselor Bennett. *Id.* at 2-3. The plaintiff claims that the defendants violated his First Amendment rights to free speech and free exercise of religion and subjected him to cruel and unusual punishment under the Eighth Amendment. *Id.* at 9-10. He seeks monetary, injunctive, and declaratory relief. *Id.* at 10-11. On December 6, 2018, Magistrate Judge William I. Garfinkel granted the plaintiff's motion to proceed *in forma paupers*. *See* Order No. 6. For the following reasons, the complaint is dismissed in part.

## I. Standard of Review

Pursuant to 28 U.S.C. § 1915A, this Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)).

## II. Factual Allegations

The plaintiff is a practicing Muslim. Compl. ¶ 9. He works in the kitchen at MWCI. One day in May of 2017, Ralph Rossi, the kitchen supervisor brought in his own pork and cooked it in the facility ovens, the same ovens where prisoner meals are prepared. *Id.* at ¶ 10. Muslim meals are also prepared in those same ovens, and Rossi cooked his pork during

2

Ramadan.[1]  *Id.* at ¶ 11.  Rossi did not clean the ovens after using them to cook his pork.  *Id.* at ¶ 12.  The plaintiff immediately sent a request to Warden Mulligan complaining about Rossi's violation of institutional policies.  *Id.* at ¶ 13.

On June 3, 2017, Rossi gathered all of the kitchen workers in the dining area and said, "I'm going to find the rat in my kitchen and kill it. [P]eople need to stop minding my business and mind their own.  Whoever you are you need to try again.  I have too much power . . . I'm batting a thousand."  Compl. ¶ 14.  Rossi stood next to the plaintiff as he gave his last comments.  *Id.*

On June 8, the plaintiff was not called to work his 5:00 a.m. shift in the kitchen.  Compl. ¶ 15.  He was removed from the work list without a clear reason or sufficient notice.  *Id.*  He asked a correction officer to call the kitchen and inquire as to why he had been removed from the work list.  *Id.* at ¶ 16.  After contacting the kitchen staff, the officer informed the plaintiff that he was not fired; "he just wasn't wanted in the kitchen anymore because he was a snitch who didn't know how to mind his business."  *Id.* at ¶ 17.  The officer suggested that the plaintiff find another work assignment.  *Id.*

The plaintiff went to Captain Paton, his unit manager, and told him about the circumstances surrounding his removal from the kitchen.

---

[1] Ramadan is celebrated on the ninth month of the Muslim calendar with fasting, prayer, and faithful intention.  Ramadan, http://www.britannic-a.com/topic/Ramadan.

Compl. ¶ 18.  Paton assured the plaintiff that he would look into the matter.

*Id.*  The plaintiff also spoke with the other kitchen supervisors, Oliver,

Rodriguez, Williams, and Johnson, asking them why he had been removed.

*Id.* at ¶ 19.  The four supervisors told him, "Rossi makes the list, and you

crossed him.  [Y]ou put your nose in the wrong person['s] business so

we're not getting involved."  *Id.* at ¶ 20.

On June 22, the plaintiff filed a grievance regarding the situation with

Rossi, explaining that Rossi had retaliated against him for reporting that he

had cooked personal pork products in the facility ovens.  Compl. ¶ 21; Pl.'s

Ex. A (Dkt. No. 1 at 12-13).  He also requested that the other supervisors

move him to the second kitchen shift in order to avoid any future problems

with Rossi.  Compl. ¶ 22.  In response to the grievance, Paton suggested

that the plaintiff write an apology letter to Rossi "for not minding his

business."  *Id.* at ¶¶ 23-24.  The plaintiff, who just wanted his job back,

agreed and wrote the apology letter to Rossi.  *Id.* at ¶ 25.

When the apology letter was delivered to Rossi on July 15, it became

a significant topic of discussion amongst the kitchen staff at MWCI.

Compl. ¶¶ 25-26.  The letter was posted on the kitchen supervisors' office

window with the word "snitch" written on the bottom in bold letters.  *Id.* at ¶

27.  The plaintiff asked several staff members about the posting, but none

of them gave him any information, and many of them joked about the

posting.  *Id.*

The plaintiff addressed the posting with Paton, explaining that his plan for writing an apology letter had backfired. Compl. ¶ 29. Paton told the plaintiff not to worry and that he would see about getting him his job back. *Id.* at ¶ 30.

After nothing was done to address the problem, the plaintiff went back to the other kitchen supervisors, Oliver, Johnson, Osle, Rodriguez, and Williams, and asked them why he had not been permitted to return to work in the kitchen. Compl. ¶ 31. The five supervisors said that the reason was "because [he] [had] sent that request to [Mulligan's] office about Rossi." *Id.*

On July 31, Rossi entered the plaintiff's housing unit during chow time. Compl. ¶ 32. The plaintiff approached him and asked why he had not been permitted to return to work. *Id.* Rossi said, "You'll never work in my kitchen again. I don't care who says otherwise or has something to say about it. [M]y kitchen, my rules, my workers." *Id.* at ¶ 33. Rossi then turned to another prisoner in the area and said, "If this snitch [(referring to the plaintiff)] comes back to my kitchen, he'll be my bitch." *Id.*

After Rossi left the area, the plaintiff went to a correction counselor, explained what had just occurred, and asked her to file a PREA[2] complaint against Rossi. Compl. ¶ 34. The plaintiff was permitted to call the PREA hotline. *Id.* Afterward, the counselor said that she would draft an incident

_____

[2] **The Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301, is a federal law enacted in 2003 to deter instances of sexual assault and harassment of prisoners.**

report based on what the plaintiff had told her and that the plaintiff needed to report all interactions with Rossi. *Id.* at ¶ 35. The plaintiff then wrote two requests to Commissioner Semple and Warden Mulligan, explaining the incident that occurred on July 31, particularly the comments made by Rossi. *Id.* at ¶¶ 36-37; Pl.'s Exs. D, E (Dkt. No. 1 at 16-19).

On August 4, the plaintiff was walking back to his unit when he was approached by Supervisor Oliver. Compl. ¶ 38. Oliver informed the plaintiff that he had been moved to the second shift in the kitchen, which starts at 1:00 p.m. *Id.* at ¶ 39. He asked the plaintiff if he felt safe working on the weekend with Rossi. *Id.* at ¶ 40. The plaintiff assured Oliver that he was okay with working on the weekend. *Id.*

The plaintiff returned to work at 1:00 p.m. without incident, but he was not permitted to work on the weekend because Rossi had refused to call him to work. Compl. ¶ 41. He documented the missed work days and sent a request to Mulligan, Paton, Oliver, and Counselor Bennett. *Id.* at ¶ 42. None of the addressees responded to the request. *Id.* From then on until October 14, 2017, the plaintiff was not permitted to work while Rossi was the supervisor on duty. *Id.* at ¶ 44.

On October 13, after attending Muslim services, the plaintiff returned to the kitchen intending on working, but Rossi once again would not permit him to work. Compl. ¶ 45. Lieutenant Harris had been in the area at the time, and the plaintiff tried to explain to her what was going on. *Id.* at ¶ 46. However, Harris rejected the plaintiff's complaint and told him, "I already

know what happened, Mendez.  [Y]ou snitched on Rossi, so I'm not going to tell him to open the door.  [S]o go back to your unit now." *Id.*  The plaintiff returned to his unit where he informed Counselor Bennett about what had occurred.  *Id.* at ¶ 47.  Bennett assured him that she would deal with the issue before leaving for the day, but she never did.  *Id.*

On October 14, Rossi was supervising the kitchen staff for the weekend and once again failed to call the plaintiff to work.  Compl. ¶ 48.  The plaintiff asked a unit officer to contact a lieutenant about the issue.  *Id.*  A short time later, Lieutenant Legassey came to speak with the plaintiff, and the plaintiff explained the entire situation regarding Rossi.  *Id.* at ¶¶ 49-51.  After leaving for a period of time to investigate the issue, Legassey returned with Harris and four other officers and took the plaintiff to a restrictive housing unit ("RHU").  *Id.* at ¶ 52.  Legassey told the plaintiff that he was being placed in RHU "because he was a rat who told on his co-worker and because he was a fake-ass Muslim who was mad that he didn't get called to work, but now [he] didn't have a job to get called to and [Legassey] would make sure it stayed that way."  *Id.* at ¶ 55.  Legassey then walked away from the plaintiff's door.  *Id.*

On October 15, the plaintiff received a disciplinary report ("DR") for interfering with the safety and security of facility staff and for allegedly yelling at the unit officer to immediately call a lieutenant for him.  Compl. ¶ 56; Pl.'s Ex. G (Dkt. No. 1 at 21).  The next day, he spoke with the DR investigator and told him that the DR was a retaliatory action to help Rossi

and the kitchen staff "silenc[e] [him] for good."  Compl. ¶ 58.  The DR investigator told the plaintiff that he would talk to a few people and return later in the day or the next day with a decision.  *Id.* at ¶ 62.  He returned approximately forty-five minutes later and told the plaintiff that the DR "had been thrown out" but that the plaintiff would remain in the RHU until he could be transferred to another facility.  *Id.* at ¶ 63.  The investigator could not give a reason why the DR had been disposed.  *Id.*

The plaintiff then spoke with Captain Rivera concerning his housing status and pending transfer, which he believed to be a retaliatory action.  Compl. ¶ 64.  Rivera told him, "[S]top complaining about not being called to work.  [Y]ou told on the man so suck it up and deal with it like a man.  [N]ext time don't put your nose where it don't belong and you'll be okay, but either way, you'r[e] out of my jail and on your way to Corrigan."  *Id.*  The plaintiff was transferred to the Corrigan-Radgowski Correctional Institution ("Corrigan") on October 23, 2017.  *Id.* at ¶ 65.

When he arrived at Corrigan, the plaintiff grieved his transfer.  Compl. ¶ 66; Pl.'s Ex. K (Dkt. No. 1 at 26-27).  However, his grievance and subsequent appeal were denied at all levels.  Compl. ¶ 66; Pl.'s Exs. L-O (Dkt. No. 1 at 27-32).

III.   Analysis

The plaintiff raises four claims against the defendants in this case. First, he claims that Mulligan, Paton, Rivera, Harris, Legassey, and Bennett "fail[ed] to protect" him from misconduct by other correctional officials

thereby subjecting him to cruel and unusual punishment.  Compl. ¶ 68.

Second, he claims that all of the defendants except Rossi "failed to

supervise and enforce DOC policies . . . intervene or correct the behavior of

the defendants . . . [and] report and/or discipline any of the defendants that

violated [his] [F]irst and [E]ighth Amendment rights . . . ."  *Id.* at ¶¶ 69-70.

Third, he claims that all of the defendants except Bennett retaliated against

him for exercising his First Amendment rights.  *Id.* at ¶¶ 71-72.  Finally, he

claims that Rossi violated his First Amendment right to freely exercise his

religion.  *Id.* at ¶ 73.  For all of these violations, the plaintiff seeks monetary,

injunctive, and declaratory relief.  *Id.*  at 10.  The Court will permit the First

Amendment retaliation claim to proceed but dismiss the Eighth

Amendment claim and the free exercise of religion claim.

## A. <u>Declaratory and Injunctive Relief</u>

In addition to damages, the plaintiff seeks declarations that the

defendants violated his constitutional rights and "permanent injunction[s]"

ordering all defendants to "adhere to the United States Constitution" and

ordering Rossi to adhere to the DOC Administrative Directives and stop

cooking personal food products in DOC facility ovens.  Compl. at 10.

These requests for relief are not warranted.

Declaratory relief serves to "settle legal rights and remove

uncertainty and insecurity from legal relationships without awaiting a

violation of that right or a disturbance of the relationship."  *Colabella v.*

*American Institute of Certified Public Accountants*, No. 10-CV-2291 (KAM)

(ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sep. 28, 2011) (citations omitted). It operates prospectively to enable parties to adjudicate claims before either side suffers great damages. *See In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d Cir. 1998). Here, the plaintiff requests declarations that the defendants violated his constitutional rights, which are not warranted. *See Ward v. Thomas*, 207 F.3d 114, 119-20 (2d Cir. 2000) (Eleventh Amendment bars declaration that state violated federal law in the past). He has not identified any ongoing legal problems warranting resolution by declaratory relief.

Similarly, a request for injunctive relief cannot be based on past conduct. *See Inside Connect, Inc. v. Fischer*, No. 13-CV-1138 (CS), 2014 WL 2933221, at *7 (S.D.N.Y. June 30, 2014) (Eleventh Amendment bars prisoner's claim for injunctive relief based on officials' past conduct that is no longer ongoing). There are no allegations indicating that Rossi or any of the defendants listed are continuing to violate the plaintiff's constitutional rights. The plaintiff's claims are based on their past conduct of retaliating against him for complaining about Rossi's behavior while at MWCI. Moreover, "an injunction [must] be 'more specific than a simple command that the defendant obey the law.'" *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011)). Thus, the plaintiff's request for orders that the defendants adhere to Administrative Directives and the Constitution are unwarranted.

Based on the foregoing, the requests for declaratory and injunctive relief are dismissed. Because the plaintiff may not sue any of the defendants in their official capacities for damages; *Kentucky v. Graham*, 473 U.S. 159 (1985); all claims against the defendants in their official capacities are dismissed. *See Watson v. Doe*, No. 1:15-CV-1356 (BKS) (DEP), 2016 WL 347339, at *41 n.5 (N.D.N.Y. Jan. 28, 2016) (dismissing all claims against defendants in official capacities when plaintiff does not seek declaratory or injunctive relief). The Court will now analyze whether the plaintiff has stated plausible constitutional claims for damages against the defendants in their individual capacities.

B. <u>Failure to Protect</u>

The Eighth Amendment's prohibition on cruel and unusual punishment includes a prohibition on inhumane conditions of confinement. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates." *Hudson v.* Palmer, 468 U.S. 517, 526-27 (1984). The standard for an Eighth Amendment claim contains both an objective and a subjective component: objectively, "the prison officials' transgression" must be "'sufficiently serious,'" and subjectively, "the officials [must have] acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.* with 'deliberate indifference to inmate health or safety.'" *Phelps*, 308 F.3d at 185 (quoting *Farmer*, 511 U.S. at 834).

In this case, there are no allegations that any of the defendants subjected the plaintiff to inhumane conditions of confinement or failed to protect him from harm. The fact that the plaintiff lost his work assignment after complaining about Rossi's behavior is insufficient to state an Eighth Amendment claim. *See Charles Christopher Fonck III v. Semple*, No. 3:18-CV-1283 (KAD), 2018 WL 4654700, at *5 (D. Conn. Sept. 27, 2018) (dismissing conditions of confinement claim grounded in denial of educational and job opportunities and eligibility for parole). Thus, the "failure to protect" claim is dismissed.

### C. First Amendment Retaliation

The plaintiff claims that all of the defendants except Bennett retaliated against him, in violation of his First Amendment rights. "Prison officials may not retaliate against inmates for exercising their constitutional rights." *Riddick v. Arnone*, No. 3:11-CV-631 (SRU), 2012 WL 2716355, at *6 (D. Conn. Jul. 9, 2012). "To prevail on a First Amendment retaliation claim, [the plaintiff] must establish (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection between the protected [speech] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted); *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). "In the prison context, 'adverse action' is objectively defined as conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *O'Diah v. Cully*, 08-

CIV- 941, 2013 WL 1914434, at *9 (N.D.N.Y. May 8, 2013) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)); *see alo Ramsey v. Goord*, 661 F. Supp. 2d 370, 399 (W.D.N.Y. 2009) (prisoners may be required to tolerate more than average citizens before alleged retaliatory action against them is considered adverse).  In order to allege causation, the plaintiff must state facts "suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)).

    "Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient." *Riddick*, 2012 WL 2716355, at *6; *see also Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) ("virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act"), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  "Accordingly, plaintiffs in retaliatory motive cases must plead 'specific and detailed factual allegations which amount to a persuasive case' or 'facts giving rise to a colorable suspicion of retaliation.'" *Moore*, 92 F. Supp. 3d at 120 (quoting *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001)).

    The Court agrees that the plaintiff has stated a plausible retaliation

claim against Rossi, Harris, Legassey, and Rivera, all of whom allegedly took adverse action in response to his complaints about Rossi and his work assignments. He alleges that Rossi refused to permit him to work in the kitchen on several occasions in response to his written complaint regarding Rossi's use of facility ovens. He alleges that Harris and Legassey filed a DR against him and placed him in RHU after complaining about Rossi's behavior. Finally, Rivera's statements to the plaintiff to not "put [his] nose where it don't belong" and "either way, you'r[e] out of my jail," support an inference that Rivera had the plaintiff transferred to Corrigan in response to his complaints about Rossi. The Court will construe these allegations liberally and permit the First Amendment retaliation claim to proceed against Rossi, Harris, Legassey, and Rivera.

The plaintiff has not, however, alleged facts indicating that any of the other defendants took adverse action against him in response to his complaints about Rossi. "It is well settled . . . that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted). The facts indicate that the decision to ban the plaintiff from his work assignment in the kitchen came from Rossi; Compl. ¶¶ 20, 31-33, 41, 45; and there are no allegations that the other defendants were directly involved in that decision.

The only remaining question is whether the plaintiff can state a claim against the defendants who allegedly failed to take corrective action in

response to his complaints about Rossi's behavior.  A plaintiff who sues a supervisory official for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct.  *Wright*, 21 F.3d at 50; *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983).

As noted above, the plaintiff has not alleged facts showing that any of the defendants other than Rossi, Harris, Legassey, and Rivera were directly involved in retaliating against him.  The plaintiff also has not alleged facts showing that the retaliation was done as a result of an official policy or custom or that any of the supervisory defendants acted negligently in managing Rossi.  Thus, the only way the plaintiff could establish supervisory liability against any of the defendants is by showing that they failed to act in response to his complaints about Rossi's retaliatory behavior.

The plaintiff alleges that Mulligan, Paton, Oliver, and Bennett failed to respond to his written complaints about Rossi.  He attached Mulligan's

response to the complaint regarding the July 31 incident, which states that the video surveillance system did not support the plaintiff's allegations. Pl.'s Ex. F (Dkt. No. 1 at 20). The fact that these defendants failed to respond to his written request does not support a claim that they were personally involved in the retaliation against the plaintiff. *See Jusino v. Mark Frayne*, No. 3:16-CV-961 (MPS), 2016 WL 4099036, at *5 (D. Conn. Aug. 2, 2016) (denial of grievance insufficient to establish personal involvement of supervisory defendant). Additionally, the plaintiff alleges that Paton and Bennett had assured him that they would investigate the issue with Rossi but failed to do so; Compl. ¶¶ 18, 47; and that, in response to the plaintiff's complaints, Paton suggested that the plaintiff write an apology letter to Rossi. *Id.* at ¶¶ 23-24. The Court does not find these allegations sufficient to show personal liability for the retaliation claim on the part of Paton or Bennet. Thus, the supervisory liability claim against Mulligan, Paton, and Bennet is dismissed.

However, as for the other kitchen supervisors, Oliver, Johnson, Osle, Rodriguez, and Williams, the plaintiff alleges that he complained to them on at least two occasions about Rossi's retaliatory behavior, and all of them agreed that the reason why he had been banned from the kitchen work assignment was because he had complained about Rossi's misconduct. *See* Compl. ¶¶ 20, 31. Based on the alleged statements of these individuals, the Court will permit the retaliation claim for damages to

proceed against Oliver, Johnson, Osle, Rodriguez and Williams under a supervisory liability theory.

### D. First Amendment Free Exercise of Religion

The plaintiff also claims that Rossi violated his right to freely exercise his religion under the First Amendment through his retaliatory action of banning him from his kitchen work assignment. *See* Compl. ¶ 73.

The Free Exercise Clause of the First Amendment requires that government officials respect, and avoid interference with, the religious beliefs and practices of the people. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Therefore, a prisoner's free exercise claim is "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* (quoting *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988)). A government action challenged under the Free Exercise Clause "passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v.*

*Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987)).

In *Salahuddin*, the Second Circuit held that, to state a plausible free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." 467 F.3d at 274–75; *see also Kole v. Lappin*, 551 F. Supp. 2d 149, 154 (D. Conn. 2008) (inmate must show that disputed policy substantially burdens sincerely held religious beliefs). "A substantial burden exists where the [government] 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). In evaluating whether the prisoner has made this showing, this Court does not "evaluate the objective reasonableness of the prisoner's belief . . ." *Ford*, 352 F.3d at 590. Rather, the Court's "scrutiny extends only to whether [the prisoner] sincerely holds a particular belief and whether the belief is religious in nature." *Id.* (internal quotations omitted).

More recently, the Second Circuit has expressed doubt as to whether the prisoner must make this threshold showing. *See Holland*, 758 F.3d at 220 (noting that the *Salahuddin* holding regarding the substantial burden threshold requirement may have been overruled by *Employment Division v. Smith*, 494 U.S. 872, 887 (1990), but declining to reach that question). Nevertheless, district courts in this Circuit continue to apply the substantial burden test in analyzing free exercise claims. *See, e.g., Jones*

*v. Annucci*, No. 16-CV-3516 (KMK), 2018 WL 910594, **13-14 (S.D.N.Y. Feb. 14, 2018) (applying substantial burden test to inmate's claim that prison officials prohibited him from attending religious services).  If the prisoner states a plausible free exercise claim, the defendant then bears the limited burden of showing that the challenged conduct was reasonably related to legitimate penological interests.  *Salahuddin*, 467 F.3d at 275; *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In this case, the plaintiff has failed to show that Rossi substantially burdened his exercise of religion.  There are no facts explaining how Rossi's decision to ban the plaintiff from his work assignment in the kitchen prevented or burdened the plaintiff's ability to practice his Muslim religion.  To the extent his free exercise claim is based on Rossi's act of cooking his pork in the facility's oven, the Court does not agree that this one isolated act "put[] substantial pressure on [the plaintiff] to modify his behavior and to violate his beliefs" based on the facts alleged.  *Forde*, 612 F. Supp. 2d at 177.  Therefore, the free exercise claim is dismissed.

### ORDERS

(1) The plaintiff's First Amendment retaliation claim shall proceed against Rivera, Legassey, Harris, Oliver, Rossi, Osle, Johnson, Rodriguez, and Williams in their individual capacities for damages.  All other claims are dismissed.  The Clerk is directed to terminate Mulligan, Paton, and Bennett as defendants to this action.

(2) The clerk shall verify the current work addresses for Rivera,

Legassey, Harris, Oliver, Rossi, Osle, Johnson, Rodriguez, and Williams with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint (Dkt. No. 1) to those defendants at the confirmed addresses within twenty-one (21) days of this order, and report to the Court on the status of the waiver requests on the thirty-fifth (35) day after mailing. If the defendants fail to return the waiver requests, the clerk shall make arrangements for in-person service by the U.S. Marshal Service on them, and they shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(3) The Clerk shall send a courtesy copy of the complaint and this Order to the Office of the Connecticut Attorney General and the DOC Office of Legal Affairs.

(4) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the Court.

(6) All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that the plaintiff **MUST** notify the Court.  Failure to do so can result in the dismissal of the case.  The plaintiff must give notice of a new address even if he is incarcerated.  The plaintiff should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.

SO ORDERED this 15th day of January, 2019, at Hartford, Connecticut.

_____
                              */s/*
VANESSA L. BRYANT
UNITED STATES DISTRICT JUDGE