# EXHIBIT B

6. In April of 2017, Kezlyn Mendez #329751 started as a kitchen worker on the first shift.

7. Inmate Mendez held the position of scullery line worker. His duties included preparing the serving trays, cleaning the trays that return from the unit and the dishwashing area, mopping the floors, and transporting food throughout the facility.

8. On Friday, September 8, 2017, I was contacted by Correctional Counselor Bennett, the Administrative Remedies Coordinator at MacDougall Walker Correctional Institution, and asked to prepare a written response to allegations by Mendez that he was prohibited from going to work after June 2, 2017 because he complained to the Warden about pork in the kitchen. See Exh. N, September 8, 2017 Email.

9. This was the first time that I heard about inmate Mendez writing to the Warden about pork being cooked in the oven.

10. We have roughly sixteen ovens in the kitchen. There are specific ovens designated for different diets. One example is our common fare oven used solely for common fare meals.

11. I have never cooked pork in the common fare oven. I only cooked food in the ovens that have a lock, which prevent inmates and others from disturbing my food, so that I do not have to over my food. There is no lock on the common fare oven.

12. Since I started in 2001, I have cooked pork less than five times while at work. This is done infrequently and does not run afoul of any policy.

13. On the rare occasion that it has occurred I have taken extra steps to sanitize the utensils, appliances and anything that may have come in contact with the pork.

14. Pork was not the reason why Mendez was instructed to leave the kitchen.

15. I prepared a statement, dated September 14, 2017, that outlined everything that transpired on June 2, 2017 which led to me asking inmate Mendez to leave the kitchen. *See* Exh. C, Ralph Rossi's Correspondence Re: June 2, 2017.

16. On June 2, 2017, I spoke with the plaintiff about his portion serving size, his handling of the food cart, his work ethic and attitude towards me. *See* Exh. C.

17. Inmate Mendez was not receptive but argumentative, with a fowl attitude. It was apparent that he would not modify his behavior to address my concerns, which I found unacceptable. *See* Exh. C.

18. Despite me explaining his job assignment duties multiple times, Mendez was unable to stay on task and complete his job responsibilities. His unwillingness to follow my direction resulted in him being told by me to return to his housing unit. *See* Exh. C.

19. Given all of the utensils, equipment and cleaning products accessible in the kitchen it is important that inmate workers listen and follow instruction in order to maintain a safe environment.

20. At that time, I informed the plaintiff that I would not write a bad work report so that he would remain eligible to reclassify to another job. *See* Exh. C.

21. I did not want to prevent the plaintiff from easily obtaining another job.

3

22.     On June 22, 2017, I received an apology letter from the plaintiff.  *See* Exh. D, Mendez's Apology Letter to Rossi dated June 22, 2017.

23.     The apology letter took me by surprise. I was relieved because the plaintiff assumed responsibility for his conduct towards me. I accepted his apology. I believed that the plaintiff was sincere. I viewed this as an olive branch from the plaintiff, a positive interaction.

24.     I told my peers on the first shift about the apology letter when it was received.

25.     I showed CFSS2 Oliver the apology letter and discussed it with him.

26.     I never posted the apology letter, mentioned it to other inmates or referred to the plaintiff as a snitch.

27.     I was asked to respond to an Inmate Request filed by the plaintiff about our interaction on July 30, 2017. The plaintiff claimed that I told him he would be my bitch, which he perceived as sexual harassment.

28.     I prepared a written statement for Warden Mulligan dated September 13, 2017 that outlined what transpired on July 30, 2017. *See* Exh. E, Ralph Rossi's Correspondence Re: July 30, 2017.

29.     On July 30, 2017, I went to the L-2 housing unit to speak with an inmate, not the plaintiff. *See* Exh. E.

30.     As I was talking, the plaintiff attempted several times to walk behind me. I continued to direct my attention to the plaintiff, by facing him, to prevent myself from being vulnerable. *See* Exh. E.

4

31. After, I finished speaking with the other inmate I addressed the plaintiff. He asked about not being able to work in the kitchen. The plaintiff stated, "I do not back down from anyone and I am getting my job back! When I get my job back, we are going to have problems in the kitchen." I replied, "Okay" and exited the unit. *See* Exh. E.

32. It was then that I realized the plaintiff's apology letter was not sincere.

33. On August 4, 2017, the plaintiff was transferred to the second shift.

34. I was not involved with the plaintiff's transfer to the second shift.

35. In September of 2017, it was brought to my attention that the plaintiff alleged that I prevented him from working in the kitchen because of complaints he made about pork and also that I made sexual advances towards him.

36. I wrote the Warden to address the allegations made by the plaintiff. *See* Exh. C and Exh. E.

37. I was subsequently informed that the plaintiff's allegations were deemed meritless.

38. Given the severity of the plaintiff's allegations, which were completely false, I thought it best to avoid the plaintiff.

39. On October 14, 2017, I was approached by the Lieutenants Diaz and Legassey and informed that the plaintiff was having an issue with me being at work. I completed an incident report to document my concerns. *See* Exh. F, Incident Report No. MWCI-2017-10-070. Pg. 2.

40. I was afraid of Mendez. His demeanor towards me was frightening. *See* Exh. F.

41. Mendez exhibited issues with authority and was disrespectful towards me in the past. *See* Exh. F.

42. As an experienced Kitchen Supervisor, I deemed Mendez's conduct to be below the standard expected of kitchen workers.

43. His presence in the kitchen compromised the safety of kitchen staff, especially for me and women. *See* Exh. F.

44. I was concerned about my safety based on the plaintiff's conduct towards me, his attempt to malign me, coupled with his unwillingness to assume responsibility.

45. I asked that Mendez be removed from the kitchen. *See* Exh. F.

46. After I wrote the incident report I did not have any interaction with the plaintiff.

47. In December of 2017, I moved to a different facility. My transfer had nothing to do with the plaintiff.

## DECLARATION

I, Ralph Rossi, pursuant to Conn. Gen. Stat. §1-24a and 28 U.S.C. §1746, declare under the pains and penalties of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

_____        _9/15/2019_
Ralph Rossi                                            Date